IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ROXANNE MORAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:07-cv-1223 |
| | ) | |
| NOVARTIS PHARMACEUTICALS | ) | Judge Thomas A. Wiseman, Jr. |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Roxanne Moray brings this action against Novartis Pharmaceuticals Corporation ("Novartis"), alleging claims of (1) retaliatory discharge under both Tennessee common law and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304; (2) negligent or intentional misrepresentation; and (3) outrageous conduct.[1] Plaintiff having stipulated to the dismissal of her federal sex-discrimination claim, this Court's jurisdiction is premised upon diversity of citizenship. 28 U.S.C. § 1332.

Defendant Novartis has filed a Motion for Summary Judgment (Doc. No. 21) asserting it is entitled to judgment in its favor as a matter of law as to all claims asserted against it. The motion has been fully briefed and is ripe for consideration. For the reasons explained below, the Court will grant the motion in its entirety.

## I.      FACTUAL BACKBROUND

Defendant Novartis is a Delaware corporation engaged in the business of manufacturing and selling pharmaceutical products. Novartis hired Plaintiff Roxanne Moray, a Tennessee resident, on January 30, 2005 as a Pharmaceutical Sales Representative. Moray was an at-will employee. At or about the time of her initial engagement, she signed a document entitled "Employment At Will Agreement" in which she acknowledged that her employment with Novartis could be terminated with or without cause, with or without notice. (Doc. No. 21-2, at 1.)

_____

[1] In July, 2008 Plaintiff stipulated to the dismissal of her claims for sex discrimination and defamation. (*See* Doc. Nos. 19 and 20.)

Moray's job duties as a Sales Representative included calling on doctors' offices, promoting drugs manufactured by Novartis, and distributing drug samples to the doctors visited, which the doctors in turn would distribute to their patients. At the inception of her employment, Novartis trained Moray on the receipt, storage and distribution of drug samples. Moray took and passed a test on Novartis' drug sample policies, read and reviewed Novartis' "Sample Accountability Policies and Procedures" (Doc. No. 21-2, at 15–64), and signed a document entitled "Statement of Policy on Distribution and Possession of Drug Samples" (Doc. No. 21-2, at 14). Novartis' "Sample Accountability Policies and Procedures" provides in part as follows:

> Representatives and managers have the responsibility to understand and comply with all policies and procedures. Failure to adhere to all Sample Accountability policies and procedures will result in disciplinary action up to and including termination.

(Doc. No. 21-2, at 16, § A.01.) In addition:

> Each sampling representative is responsible for the storage of samples or vouchers in a location whose condition and temperature will maintain product stability, integrity and effectiveness. Conditions include temperature control – refer to guidelines listed on packing of product; take into account for any location where product is stored (car, house, etc.).. . .

(Doc. No. 21-2, at 24, § B.01.) During her employment with Novartis, Moray understood that she was required to maintain drug samples in a climate-controlled environment.

Although she did not recall reviewing or receiving it, Moray does not dispute that she received a copy of Novartis' Code of Conduct (*see* Doc. No. 21-2, at 2–13) at the time she was hired. The Code of Conduct contains an explicit prohibition against recording the conversations of other employees without their full knowledge and consent:

> **Electronic Surveillance**
> Unauthorized electronic surveillance of employees is disruptive to employee morale and inconsistent with the respectful treatment required of our employees. For this reason, no Novartis employee may record the conversation of another employee without his or her full knowledge and consent.

(Doc. No. 21-2, at 8.)

Moray started her employment with Novartis in January 2005 as a Sales Representative for its Geigy Division, East Nashville Territory, under the supervision of District Manager Dennis Boulay. While working in the East Nashville Territory, Moray sold the drugs Elidel, Lamisil and Exelon. In January 2006, she also started selling Diovan, a blood pressure medication.

In June 2006, Moray took an unexpectedly long medical leave of absence to have back surgery and to recuperate from her surgery.  Her medical leave of absence lasted from June 2006 to November 30, 2006, during which time Moray stored samples of the drugs Diovan and Elidel in her non-climate-controlled garage.  During her leave of absence, Moray did not make any effort to have the samples returned to Novartis or transferred to co-workers.

While Moray was on leave, Novartis reorganized its sales regions and transferred Moray to the Novartis V Region, Nashville West District, Nashville West Territory, under the supervision of District Manager Lee Feliciano.  After the reorganization, Moray continued to sell the drug Diovan in the Nashville West Territory, among others.  Moray and seven other co-workers in the Nashville West Territory sold the same drugs and visited the same doctors pursuant to a twelve-day routing program.  Sales representatives in the Nashville West Territory were responsible for visiting approximately ten doctors' offices per day and were required to enter call notes for each visit, which were used for guidance by other representatives on subsequent visits to the same office.  Only one of Moray's co-workers in the Nashville West Territory, besides Moray, was under the direct supervision of Lee Feliciano.  Feliciano, however, also had supervisory responsibility for approximately eleven other representatives in the Nashville West *District*, including individuals in territories in Memphis and Jackson, Tennessee.

In December 2006, shortly after Moray's transfer to the Novartis V Region and the Nashville West Territory, and after she had returned to work after her extended medical leave, some of the samples of the medication Elidel stored in her garage became expired.  Under Novartis' Sample Accountability Policies and Procedures, Moray was required to return the samples to Novartis for destruction.  Moray was no longer promoting Elidel when she returned to work after her medical leave.  The Diovan samples were not expired but they had been improperly stored in her garage the entire duration of a long, hot summer.

From December 2006 to March 2007, Moray made no attempt to return the samples that had been stored in her garage.  By early spring, many of the Diovan samples were reaching their expiration date though they had not actually passed it.  Sometime in mid-March, she had a discussion with Feliciano about the samples that were still stored in her garage.  Moray initiated the conversation because she knew her annual sample inventory was approaching.  (Moray Dep. at 114:21–22.)  Feliciano suggested at

the time that she "get rid" of the unexpired Diovan samples (Moray Dep. at 115:21), specifically by "dumping" all the samples at one clinic, specifically St. Thomas Clinic's Dispensary of Hope. (Moray Aff. (Doc. No. 28) at ¶ 17.)  Moray knew that doing so went against Novartis policy (*see* Moray Dep. at 117:4–5), but she also sent an e-mail to Samples Operations inquiring whether she could do what Feliciano suggested; she was informed that she could not.  (*Id.*)

Moray then scheduled a day off work on April 6, 2007 in order to ship the sample boxes of both Elidel and Diovan—over 100 of them—back to Novartis.  When she told Feliciano why she was taking a day off, he instructed her not to ship the boxes.  In her affidavit, Moray states that Feliciano did not give her a reason for preventing her from shipping the samples back to Novartis at that time.  (*Id.*)  In her deposition, however, when explicitly asked whether he gave a reason, Moray responded that Feliciano told her he wanted to count the boxes, and they had an inventory scheduled for approximately two weeks later.  (Moray Dep. at 99:22–100:2.)  Laurie VanValkenburgh from Novartis' Sample Accountability Department likewise explained to Moray that if Moray sent the samples back so soon before her inventory, they might not be accounted for on the receiving end at the time of the inventory and this would create a variance in her inventory.  (*See* 4/6/07 E-mail from VanValkenburgh to Moray (Doc. No. 21-2, at 76) ("At this point, it is best to include them in your Annual Inventory because the return may not get posted until after your inventory and it could cause a variance (especially with the volume of Zelnorm returns the warehouse is getting hit with.").)  Feliciano's instruction and VanValkenburgh's explanation were consistent with Novartis' Sample Accountability Policy, which states that sales representatives are to "refrain" from returning drug samples to Novartis within ten business days of a scheduled sample inventory.[2]  Moreover, Novartis's Sample Accountability Policy requires that each District Manager conduct an annual sample inventory of each employee under his or her supervision at the location where the employee stores his or her samples.

At the inventory conducted on April 17, 2007, Feliciano confirmed what Moray had already

---

[2] In her response to the Defendant's Statement of Undisputed Facts, Moray "admits" for purposes of the motion for summary judgment that Feliciano scheduled her sample inventory for April 17, 2007. (Doc. No. 29, Resp. to ¶ 21.)  In response to the very next paragraph, however, Moray asserts that Feliciano "NEVER announced or scheduled an inventory" with her.  (Doc. No. 29, Resp. to ¶ 22 (citing Moray Aff. (Doc. No. 28) at ¶ 18).)  In her deposition, she stated that at least as of April 6, she was aware that Feliciano had scheduled her inventory for approximately two weeks later.  (Moray Dep. at 99:25–100:2.)

communicated to him: that Moray had expired samples of Elidel and samples of Diovan that were nearing expiration in her possession, and that she had been storing these samples in her garage, which was not climate-controlled. Feliciano admonished Moray for not dispensing the expired medications before their deadline. In addition, although he knew the Diovan samples had been improperly stored, Feliciano directed Moray to distribute the unexpired samples of Diovan to other sales representatives. He also contacted other managers in the Territory to let them know he had a representative with extra unexpired samples to be distributed if any other representatives needed samples. Moray objected to distributing the Diovan samples on the grounds that they had not been stored properly. According to Moray, Feliciano seemed "very upset and hostile" as a result of her challenging his decision. (Moray Aff. ¶ 5.) Moray nonetheless continued to voice her disagreement and pointed to the Prescribing Information included on Diovan's packaging that stated that the medicine must be stored at 77 degrees Fahrenheit. Moray further attests that Feliciano, "[t]o prove his point that the samples were fine to distribute to physicians," spoke with employees in Novartis' Sample Operations and Legal Departments, both of whom purportedly authorized him to distribute the samples. (*Id.* ¶ 6.) Moray continued to protest on the basis that Feliciano had not explained to the persons with whom he spoke in either department that the samples at issue had been stored over the summer in a non-air-conditioned garage. Feliciano overrode her objections and told her he did not want to discuss the matter further. Based on Moray's testimony, it is clear that from that point forward, her relationship with Feliciano was quite strained.

Following the sample inventory, Feliciano conducted a field ride with Moray for several days, during which he observed her performance. The day after the inventory, at Feliciano's direction and in his company, Moray dropped off a large portion of the Diovan samples, a thousand bottles of pills, at St. Thomas Clinic for use in its Dispensary of Hope. They met with Joy Smith, Clinical Director for St. Thomas Medical Clinic, who explained the Dispensary of Hope program and told Moray and Feliciano how much they appreciated the samples. She was aware that they were near expiration, but she was not informed at that time that they had been improperly stored. Moray testified that she did not tell Smith about the improper storage because she was afraid she was going to lose her job, and also claimed Feliciano basically forced her to "dump" the samples at St. Thomas. (Moray Dep. at 131:11–133:15.)

At the end of Feliciano's observation of Moray's performance he prepared and, at a one-on-one

meeting on April 20, 2007, issued Moray a Conduct Memo reprimanding her regarding her possession of the expired Elidel samples. In the Memo, Feliciano stated that her possession of a "significant amount of expired samples" that had not been returned to the Novartis sample destruction vendor was "unacceptable." (Doc. No. 21-2, at 65.) He also reminded her that, pursuant to Novartis' sample return policy, expired product could not be distributed and instead must be returned to the Novartis sample destruction vendor. (*Id.*)

Moray speculates that Feliciano "obviously" gave her the Conduct Memo to punish her for having challenged his authority regarding distribution of the improperly stored Diovan samples (*id.* ¶ 10), and that Feliciano was "laying out a paper trail to get [her] fired because [she] challenged him" (*id.* ¶ 22). In support of her opinion in that regard, Moray points out that Feliciano knew about the expired samples well in advance of conducting the inventory, knew she had previously tried to return them to Novartis, and knew that she was not trying to distribute them to physicians. Moray also contends that having unreturned samples was not something for which sales representatives typically received conduct memoranda, particularly when no prior disciplinary action had been taken against them. Novartis points out that Feliciano also issued a conduct memo to Curly Harris, another sales representative under his supervision who was also found to have expired samples in his annual inventory in April.

Also at the April 20, 2007 meeting, Feliciano issued Moray a Territory Coaching Plan. A Territory Coaching Plan is a document used by Novartis purportedly to help sales representatives improve their sales performance and to address negative sales trends. According to Novartis, Moray was experiencing negative sales trends and her sales ranked lowest in the territory (6 out of 6) and second to last in the region (65 out of 66). Novartis asserts that the Territory Coaching Plan was issued to Moray to address low sales figures and to create goals and expectations in order to help her improve her performance. Moray contends that the true purpose of the Coaching Plan was to increase her work load and induce her to resign. In support of her opinion in that regard, Moray points out that at the time Feliciano issued the Territory Coaching Plan to her, other members besides Moray were also among the bottom 15% in terms of sales rankings but she was the only one placed on a Coaching Plan. In addition, Moray contends she was the newest representative in the district, and had only actually been working in the territory for 33 days at the time the Territory Coaching Plan was issued.

Unbeknownst to Feliciano, Moray tape-recorded the April 20 meeting.

After issuance of the Territory Coaching Plan, Novartis perceived that Moray's performance continued to decline. For instance, she failed to enter call notes from her daily appointments from April 16 through April 30, and from May 29 through June 18, and failed to complete mandatory training modules on the new drug Exforge by June 10, 2007. She failed to attend a three-day training seminar in Texas in June and did not notify any of her supervisors in advance that she would not be attending. She also missed meetings on June 14 and June 25. In addition, in response to an innocuous e-mail from Feliciano sent to the five sales representatives in the Nashville West District under his supervision, Moray replied as if it were a personal attack on her, and copied all five of the sales representatives who had received Feliciano's original message.[3] Moray offers excuses for nearly all of these problems but does not deny that they occurred.

Meanwhile, following Feliciano's issuance of the Conduct Memo and Territory Coaching Plan on April 20, Moray made a formal complaint to Novartis' Human Resources Department about Feliciano's handling of the improperly stored Diovan samples. Specifically, she spoke with Kristen Marks, Associate Director of Human Resources, and complained that Feliciano had lied to Novartis management about the condition of Moray's samples by not informing management that she had stored the drugs improperly, and that he violated Novartis' policy when he directed her to dispense samples that had been improperly stored.

Shortly after she lodged her complaint with Human Resources, Moray hand-delivered a letter to Joy Smith at St. Thomas. In her letter and in a conversation with Smith, Moray informed her that the

---

[3] Feliciano's e-mail included slides for the employees to review on the new drug Exforge and ended with the sentence, "I look forward to a successful launch in the Nashville West district!" (Doc. No. 21-2, at 71.) Moray, apparently failing to recognize that the recipients to whom the message were sent were all in the Nashville West district (though not in the Nashville West *territory*), replied to all recipients, stating:

Lee,
Will you please enlighten me as to why you singled out my district, Nashville West, in your last sentence? Are you not looking forward to a successful launch in everyone's district?

Are you trying to be funny, sir? Maybe you think it's funny to try and destroy someone, but, you will be exposed for the unscrupulous manager that you are in the end. Thank you for trying to embarrass me yet again!

You are a real class act, sir!
(*Id.*)

Diovan samples she had dispensed to Smith on April 18, 2007 had been stored improperly. Moray expressed a concern that the samples might be degraded as a result of the improper storage, and she urged Smith to destroy them rather than distributing them to patients. She also noted that she had informed the Novartis Human Resources Department about the matter and was told that it would be investigated but that the person who would conduct the investigation would be on vacation until May 10.

Moray also alleges that she sent a letter to Christine Oliver of the FDA informing her of her concerns regarding Feliciano's directive that she distribute samples of Diovan that had been improperly stored. According to Moray, Oliver was "not in charge of this matter" but told Moray "she would definitely filter it to the responsible party." (Moray Aff. ¶ 13.) There is no further information in the record regarding this report to the FDA.

Ultimately, Novartis flew both Feliciano and Moray to New Jersey in June 2007 to meet with management at company headquarters regarding Moray's complaint about Feliciano's instructions to her on dispensing the improperly stored Diovan samples. Investigators met with both Moray and Feliciano, and the investigation resulted in Feliciano's receiving a Conduct Memo for poor sample direction to subordinates. Feliciano has testified that, as a result of this incident and the Conduct Memo, he received a poor rating on his subsequent evaluation and did not receive a pay raise for that year. Moray was informed only that Feliciano had received a Conduct Memo.

On June 27, Moray met with Novartis Regional Director Mark Lloyd, who gave her a Conduct Memo addressing the various performance issues that had arisen over the previous several months, including her missing mandatory meetings, failure to enter call notes, her insubordinate e-mail to Feliciano and other issues. (Doc. No. 21-2, at 72–73.) In the Memo, Lloyd expressly acknowledged Moray's report on June 11, 2007 that she had been experiencing problems with her computer, but noted that the Help Desk did not have any record of her reporting problems between April 7, 2007 and June 11, 2007. He also acknowledged Moray's assertion that a medical emergency had prevented her from attending the mandatory meeting in Dallas beginning on June 11, but observed that she never provided medical documentation to substantiate her inability to attend the meeting. The Memo concludes: "Roxanne, I am confident we will have no further occurrences, however, I must inform you the violation of the requirements outlined in this memo could result in further disciplinary action, up to and including

termination of employment." (Doc. No. 21-2, at 73.) Moray signed and dated the Memo, indicating she had read and understood it. (*Id.*)

During a telephone conference with Kristen Marks that also occurred on June 27, 2007, for the purpose of discussing the outcome of the investigation into Moray's complaints about Feliciano, Moray admitted to Marks that she had secretly taped her April 20 meeting with Feliciano in which Feliciano presented Moray with a Field Coaching Report and the Conduct Memo addressing sample disposition. Moray also admitted to Marks that she was tape-recording the conversation between Moray and Marks. On July 3, 2007, Novartis terminated Moray's employment. The letter giving notice of termination states that Moray was being terminated for violating Novartis' Code of Employee Conduct regarding unauthorized recording of her conversations with other Novartis employees. (Doc. No. 21-2, at 74.) The unauthorized tape-recording is the sole reason given by Novartis for Moray's termination.

Novartis asserts that it has terminated two other former employees for secretly tape-recording co-workers in violation of the electronic surveillance provision in Novartis' Code of Conduct. Novartis has not indicated when these instances occurred or described the underlying facts.

## II.    STANDARD OF REVIEW

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the " 'inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.' " *Matsushita*, 475 U.S. at 587. "The mere existence of a scintilla of evidence in support of plaintiff's position[, however,] will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52. "A genuine dispute between the parties on an issue

of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247–49).

## III.  ANALYSIS AND DISCUSSION

### A.  Retaliatory Discharge

Tennessee has long adhered to the common-law doctrine of "at-will" employment, which provides that employment contracts of indefinite duration are terminable at the will of the employer or the employee, for good cause, bad cause or no cause at all. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 534–35 (Tenn. 2002). However, a narrow exception to this doctrine—the "public policy exception"— restricts an employer's right to terminate an employee when such an action would violate a clearly established public policy. *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 555–56 (Tenn. 1988). To prevail on a claim of common-law retaliatory discharge, an employee must prove (1) that an at-will employment relationship existed between the employee and the employer, (2) that the employee was discharged, (3) that the employee was discharged for attempting to exercise a statutory or constitutional right, or for any other reason that violates a clear public policy, and (4) that such action was a substantial factor in the employer's decision to discharge the employee. *Guy*, 79 S.W.3d at 535; *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 557–58 (Tenn. 1993).

In addition to a common-law action for retaliatory discharge, the Tennessee General Assembly has adopted a statutory cause of action under the Tennessee Public Protection Act, commonly referred to as the "Whistleblower Act." The statute provides that no employee shall be discharged solely for refusing to participate in or to remain silent about illegal activities. Tenn. Code Ann. § 50-1-304(a). "Illegal activities" include state and federal criminal and civil violations, as well as violations of any regulation affecting public health, safety, and welfare. Tenn. Code Ann. § 50-1-304(c). The first three elements of statutory retaliatory discharge are thus virtually identical to the elements of the common-law claim. The fourth element, however, differs from the common law in that, to benefit from statutory protection, an employee must demonstrate that his or her refusal to participate in or remain silent about illegal activities was the *sole* reason for his or her discharge. Tenn. Code Ann. § 50-1-304(a); *Guy*, 79 S.W.3d at 535-37.[4]

---

[4] Both the common-law and the statutory retaliation claims require proof that the employee was actually discharged. *Turner v. Liberty Nat. Life Ins. Co.*, 488 F. Supp. 2d 672, 677–78 (M.D. Tenn. 2007); *Freeman v. Lewisburg Hous. Auth.*, No. M2006-01898-COA-R3-CV, 2008 WL 370708, at *3–*4 (Tenn.

The common-law and statutory protection afforded to whistleblowers stems from the principle that an employee should not be placed in the dilemma of being forced to choose between reporting or participating in illegal activities and keeping a job. *Franklin v. Swift Trans. Co.*, 210 S.W.3d 521, 530 (Tenn. Ct. App. 2006). It is a recognition of the "power of a few courageous individuals to make a lasting contribution to improving our public and private institutions." *Winters v. Houston Chronicle Pub. Co.*, 795 S.W.2d 723, 733 (Tex. 1990) (J. Doggett, concurring). The Tennessee Supreme Court, however, has repeatedly emphasized that whistleblower protection is intended to remain a narrow exception to the at-will employment doctrine. *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 n.3 (Tenn. 1997); *Chism*, 762 S.W.2d at 556. Accordingly, in analyzing a whistleblower case, courts are not limited to a determination of whether a law or regulation was violated, *Guy*, 79 S.W.3d at 538; further, an employee's actions will not qualify him or her for protection merely because the employee has pointed out an illegal activity. *Franklin v. Swift Trans. Co.*, 210 S.W.3d at 530–31. It is the court's task to determine whether the whistle-blowing activity that brought to light an illegal or unsafe practice has furthered an important public policy interest. *Guy*, 79 S.W.3d at 538. Toward that end, it is essential that the employee's attempt to expose illegal or unsafe practices do more than merely advance the employee's private interest. *Id.* at 538 n.4. Moreover, while an employee does not need to report suspected illegal activities directly to law or regulatory enforcement officials, an employee must make a report to some entity other than the person or persons who are engaging in the allegedly illegal activities. *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 371 & n.1 (Tenn. Ct. App. 2005).

In the case at bar, Moray asserts a cause of action for retaliatory discharge under both the common law and the statute. Novartis does not dispute that Moray was an employee whose employment was terminated. Novartis contends, however, that Moray cannot establish that Novartis violated a clear public policy evidenced by an unambiguous constitutional, statutory or regulatory provision or that Moray refused to participate in or remain silent about an illegal activity as required by both the Act and the common law. Novartis further argues that even if Moray could raise a disputed issue of fact as to that element, she cannot show that her complaint about illegal activity was a factor in her termination at all,

Ct. App. Feb. 8, 2008). Consequently, the other allegedly retaliatory actions on the part of Feliciano, including his giving her a Conduct Memo, placing her on a Territory Coaching Plan, and generally treating her with hostility, are not actionable.

much less a substantial or sole factor.

> ### *(1)* *Plaintiff's Refusal to Remain Silent about Feliciano's Requiring her to Dispense Improperly Maintained Drug Products*

Moray asserts that the extreme heat and humidity to which the drug samples of Diovan stored in her garage were exposed during the summer of 2007 when she was on medical leave likely had a "deleterious impact on the effectiveness of the samples" thereby "significantly shorten[ing] the stated expiration date." (Doc. No. 27, at 4.) She alleges that Feliciano's demand that she dispense these samples to doctors' offices violated the Prescription Drug Marketing Act of 1987, specifically 21 U.S.C. § 355e(a), which requires the Secretary of the Food and Drug Administration to "develop standards and identify and validate effective technologies for the purpose of securing the drug supply chain against counterfeit, diverted, subpotent, substandard, adulterated, misbranded, or expired drugs." She also asserts his action violated the FDA's Good Manufacturing Practice regulations. In her response brief, she cites vaguely to "21 C.F.R. 211," without pointing to a specific provision. In her deposition, she was more specific, pointing to 21 C.F.R. § 211.142(b), which states in pertinent part:

> Written procedures describing the warehousing of drug products shall be established and followed. They shall include. . .
>
> (b) Storage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength, quality and purity of the drug products are not affected.

Moray acknowledges that she herself violated this provision—and Novartis policy—by storing drug samples in her garage. In addition, she does not actually allege that *Novartis* violated the referenced provisions. In fact, she claims that Feliciano lied by omission to Novartis' Legal Department and Samples Operation Department when he called them to ask about dispensing the drugs, by not telling them the samples had been stored in Moray's garage over the summer. Moreover, as Novartis argues, the regulations to which Moray points only indirectly implicate the dispensing of improperly stored drugs, the wrong she attributes to Feliciano's directive. She does not allege that Novartis had a policy of dispensing improperly stored drugs, and she does not allege any facts suggesting that Novartis itself violated the cited regulation. It is largely on that basis that Novartis asserts that Moray has not established the third element of either a common-law or statutory claim for retaliatory discharge.

In *Guy v. Mutual of Omaha Insurance Company*, however, the Supreme Court somewhat expanded the scope of the whistleblower exception to the at-will employment doctrine. 79 S.W.3d 528

(Tenn. 2002). As the Sixth Circuit has explained, the "whistleblower variant of the public policy exception" protects employees "from discharge in retaliation for speaking out about illegal activities if such conduct furthers an important public policy interest embodied in the law." *Fleming v. Xerox Connect, Inc.*, 50 Fed. Appx. 211, 212 (6th Cir. 2002) (citing *Guy*, 79 S.W.3d at 538). In *Guy*, the court was faced with a plaintiff-employee who was fired after he reported the illegal activities of a co-worker. The Tennessee Supreme Court agreed with the employee's argument that certain statutes governing the licensing of insurance agents were evidence of Tennessee's public policy "with respect to protecting the public from the fraudulent activity of insurance agents," regardless of whether the insurance agency itself had violated any law. *Guy*, 79 S.W.3d at 537. In reaching its conclusion, the court noted that its inquiry in considering whether the public policy exception to the at-will doctrine applied to the circumstances before it was "not limited to whether a particular law or regulation has been violated; rather, our inquiry focuses on whether some important public policy interest embodied in the law has been furthered by the whistleblowing activity." *Id.* at 538 (internal citation omitted). Thus, as the Sixth Circuit subsequently observed,

> *Guy*'s focus on the further of the *public good* sets the stage for two significant developments in the court's efforts to define the common-law retaliatory discharge claim: (1) an employee whose "whistleblowing" is intended to expose the illegal conduct of someone *other than* the employer can maintain a common-law cause of action for retaliatory discharge; and (2) an employer's discharge can violate a public policy interest evidence by a *judicial declaration* of the law.

*Fleming*, 50 Fed. Appx. at 213.

Novartis' attempt to gloss over the facts notwithstanding, it is clear that Moray essentially "blew the whistle" on Feliciano, reporting both to a customer of Novartis', to the FDA, and to Novartis itself that Feliciano had directed her to engage in conduct that she found to be morally repugnant, in violation of Novartis' own written policies, and in violation of statutes and regulations governing the storage and distribution of drug products. Thus, with respect to whether Moray has established the third element of her a *prima facie* case of common-law or statutory retaliation, the issues presented are (1) whether the plaintiff has asserted a "well defined and established" public policy as the basis for her retaliatory discharge claim and (2) whether her reports to Joy White, the FDA and/or to Novartis itself served a public purpose that should be protected. *Guy*, 79 S.W.3d at 537 and n.4 (citations omitted).

The Court finds as a matter of law that an important and clearly established public policy interest in protecting consumers from mishandled or adulterated drug products is embodied in the federal

regulations prescribing the care that should be taken in manufacturing and storing drugs. The Court therefore finds that Moray has established the existence of an established public policy as the basis for her claim and that her reports to Joy White, the FDA, and to Novartis regarding Feliciano's activities served a public purpose that should be protected.

### (2) Whether Plaintiff's Complaints Were a Factor in Her Termination

The next question is whether Moray's reports played any role in her termination. In order to establish a common-law claim of retaliatory discharge, she must show that her refusal to remain silent about Feliciano's actions was a substantial factor in her termination. To state a statutory claim under the TPPA, she must show that it was the sole factor.

The burden of proof rests upon the plaintiff to establish a causal relationship between her reporting activity and her discharge. *Cf. Mason v. Seaton*, 942 S.W.2d 470, 473 (Tenn. 1997) ("Proof of discharge without evidence of a causal relationship between [the protected activity] and the discharge does not present an issue for the jury."). If the plaintiff does present evidence of a causal connection between her reporting activity and her discharge, then the employer must come forward with evidence of a legitimate, non-pretextual reason for the employee's discharge in order to refute the plaintiff's evidence of a causal connection. *Id.* (citation omitted). In making the determination of whether a genuine issue of fact exists regarding the cause of the plaintiff's discharge, the Court must "view the evidence in a light favorable to the nonmoving party and allow all reasonable inferences in [her] favor." *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993), *quoted in Mason*, 942 S.W.2d at 473. Proximity in time between the protected act and the discharge is not sufficient to establish a causal relationship. *See Conatser v. Clarksville Coca-Cola*, 920 S.W.2d 646, 648 (Tenn. 1995) (holding that the fact that the employee-plaintiff was fired three days after returning to work after an injury for which he had received worker's compensation benefits was not sufficient to establish that he was fired for making a worker's compensation claim).

As an initial matter, the Court notes that there is no evidence in the record regarding whether Novartis was even cognizant of Moray's communications with Joy Smith at St. Thomas or Christine Oliver at the FDA until after this lawsuit was filed. Accordingly, Moray has not carried her burden of proving that those reports played any role in Novartis' decision to terminate her employment.

With respect to her report directly to Novartis about Feliciano, Moray testified in her deposition that she told Kristen Marks in Novartis' HR Department "everything." She told her about the samples, that Feliciano had contacted upper management but that he had not told upper management the whole story regarding how the Diovan samples had been stored, that she and Feliciano together, at his insistence, had dropped off nearly a thousand sample bottles at one office. (Moray Dep. at 184:5–15.) Moray made this verbal report to Marks shortly after her April 20, 2007 meeting with Feliciano. Also according to Moray, Marks informed her that the matter would be investigated, but the person who would conduct the investigation was on vacation until May 10, 2007. Meanwhile, she was directed not to dispense any more of the samples that had been stored in her garage. Eventually, however, in June 2007, Novartis flew both Moray and Feliciano to New Jersey as part of its investigation into Moray's complaints. There, Moray had a "great meeting" with members of Novartis' legal and security teams, but afterwards she was, in her words, "waiting and waiting for the outcome." (Moray Dep. at 185:10–13, 186:13–15.) She was later told by Kristen Marks that Feliciano received a conduct memo. Marks did not apprise Moray specifically regarding the content of the conduct memo, but Lee Feliciano testified that he also, as a result of Moray's report, received a poor rating and did not receive a pay raise for 2007. (Feliciano Dep. (Doc. No. 21-3) at 44:3–9.)

Moray did not know that Feliciano had received a conduct memo until a teleconference with Kristen Marks and Mark Lloyd on June 27, 2007 to discuss the conclusion of Novartis' investigation into the incident involving Feliciano and to address Moray's performance issues. The fact that Moray had tape-recorded her April 20 conversation with Feliciano came to light during the first part of this conversation. Moray told Marks about the tape because she believed that Novartis "trusted and believed" Feliciano's word over hers and did not take her complaint seriously, and she apparently felt that Novartis would believe her if the company had access to the tape. (Moray Dep. at 188:15–21.) At the same meeting, Marks asked Moray if she was tape-recording her conversation with Marks, and Moray stated that she was. Marks asked her to stop taping, and Moray complied.

At about that point in the conversation, Marks asked Moray to bring Mark Lloyd back into the room to be present for the remainder of the conversation. After Lloyd entered the conversation, the meeting centered around the content of a Conduct Memo dated June 27, 2007 and issued by Mark Lloyd.

As set forth in the fact section above, the Conduct Memo detailed Novartis' concerns regarding Moray's poor performance over the course of the preceding two months. The Memo also outlined the company's expectations regarding Moray's job performance and behavior going forward.

Just under one week later, Novartis sent a letter to Moray notifying her that her employment was terminated effective immediately based upon her tape recording of the conversations with Lee Feliciano on April 20 and with Kristen Marks on June 27. The letter was signed by Barbara Brown in Novartis' HR Department, and copied to Kristen Marks and Mark Lloyd. Moray does not dispute that Novartis had an express written policy prohibiting the recording of conversations with other employees without their knowledge.

The only "evidence" to which Moray points in support of her assertion that she was terminated because of her complaint about Feliciano is her speculation that Marks was "aware that what was on the tape was . . . concrete evidence that Mr. Feliciano violated Novartis policy, FDA rules, public policy." (Moray Dep. at 198.) In addition, in her response in opposition to the motion for summary judgment, Moray points to actions taken by Feliciano that she asserts were in retaliation for her having challenged him and questioned his judgment regarding distribution of the improperly stored samples. While there is ample evidence in the record that Moray had a difficult relationship with Feliciano, there is no evidence in the record that Feliciano had any input into the decision to terminate her employment. Moreover, the fact that the tape recording of her conversation with Feliciano would corroborate her version of events in and of itself is not evidence that she was fired for reporting the behavior: She had already reported the behavior and had relayed to Kristen Marks the entire story nearly two months prior to the June 27 meeting.

In sum, there is effectively no evidence in the record of a causal connection between Moray's termination and her complaints to Novartis about Feliciano. Without such evidence, the burden never shifts to Novartis to proffer a legitimate, non-pretextual reason for terminating Moray's employment. Novartis has nonetheless proffered such a reason, as previously indicated: Moray was terminated for violating Novartis' electronic surveillance policy. Moray cannot dispute the existence of the policy or that she violated it. She also does not dispute evidence proffered by Novartis that other employees have been fired for the same reason.

Because Moray has no evidence suggesting a causal relationship between her complaints about Feliciano and her termination, and because she cannot rebut Novartis' proffered legitimate, non-pretextual reason for her discharge, Moray's claim for retaliatory discharge, under both the Tennessee common law and the Whistleblower Statute, fails. Novartis is entitled to summary judgment in its favor as to that claim.

**B.    Negligent or Intentional Misrepresentation**

In order to state a claim for negligent or intentional misrepresentation, a plaintiff must establish that she relied on the alleged misrepresentation to her detriment. *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991); *Metro. Gov't of Nashville and Davidson County v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992). Here, Moray has clearly alleged that Feliciano made intentional or negligent misrepresentations by omission to third parties—other Novartis employees and to Joy Smith at St. Thomas—by not informing them that the Diovan samples had been improperly stored for many months. Moray has not, however, alleged that she herself believed those misrepresentations or that she relied to her detriment upon any misrepresentations Feliciano made. Her misrepresentation claims therefore fail as a matter of law.

**C.    Outrageous Conduct**

Moray also seeks to recover for the tort of "outrageous conduct," also known as intentional infliction of emotional distress. *See Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997) ("Intentional infliction of emotional distress and outrageous conduct are not two separate torts, but are simply different names for the same cause of action."). The Tennessee Supreme Court has summarized the elements of an outrageous conduct claim as follows:

> [U]nder Tennessee law, there are three essential elements to [an outrageous conduct] cause of action: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury.

*Id.* With regard to whether actions may be fairly characterized as "outrageous," Tennessee adheres to the following standard:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character and so extreme in degree, as to

> go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Id.* at 623 (quoting Restatement (Second) of Torts § 46 comment d (1964), and *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 274 (Tenn. 1966) (*abrogated on other grounds by Camper v. Minor*, 915 S.W.2d 437, 444–46 (Tenn. 1996))). The same Restatement comment quoted in *Bain* further provides that liability for intentional infliction of emotional distress "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Restatement (Second) of Torts § 46 comment d.

Novartis argues that, even assuming the truth of all Moray's allegations, the conduct of which she complains—subjecting her to two Conduct Memos, a Territory Coaching Plan, and her termination, as well as various petty slights by Feliciano—was not sufficiently egregious to support a claim for outrageous conduct. In addition, Novartis points out that Moray has not alleged that she suffered a severe mental injury as a result of the allegedly outrageous conduct. Moray argues in response that "no well informed disinterested observer could disagree that it would shock the conscience of the public if they knew that adulterated drugs were being dispensed to heart patients who might depend on them to stay alive." (Doc. No. 27, at 15.) The plaintiff does not address the defendant's contention that she has not alleged that she suffered the type of injury that a claim of outrageous conduct is intended to redress.

The Court agrees with Novartis that Moray's failure to point to any evidence that she suffered severe emotional distress is fatal to her claim. Novartis' motion for judgment will therefore be granted with regard to Moray's claim for outrageous conduct as well.

## IV. CONCLUSION

Novartis has established that it is entitled to judgment in its favor as a matter of law as to all

-----

-----

claims asserted by Moray in this action.  The motion for summary judgment will therefore be granted and this matter dismissed.

An appropriate Order will enter.


Thomas A. Wiseman, Jr.
Senior U.S. District Judge